**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02175-MSK-MEH

**TRAVIS BRICKEY,**

      **Plaintiff,**

**v.**

**WAYNE STEPHEN WEYLER;
MATTHEW LOWELL LEWIS;
JOSEPH CRAWFORD;
ANDREW WILLIAM MEANS;
CORBEN KENT TELINDE; and
MARK JOHNSON,**

      **Defendants.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING  IN PART
MOTIONS FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to Mr. Brickey's Motion for Partial

Summary Judgment (**# 28**), the Defendants' response (**# 34**), and Mr. Brickey's reply (**# 38**); and

the Defendants' Motion for Summary Judgment (**# 29**), Mr. Brickey's response (**# 35**), and the

Defendants' reply (**# 39**).

## FACTS

The following facts are undisputed, except where noted.  On August 21, 2010, an

individual named Ron Elsberry made a 911 call to Grand Junction authorities, stating that a man

and woman were involved in a physical altercation nearby.  As a result of that call, Defendant

Crawford, a Mesa County Sheriff's Deputy, was dispatched to investigate.  Deputy Crawford

arrived on the scene, spoke to Mr. Elsberry, and determined that the altercation had occurred at a

house owned by Mr. Brickey.  As Deputy Crawford approached the Brickey house, a woman,

later identified as Lori Clark, walked out the front door.  Deputy Crawford observed that Ms.

Clark's face was bruised and that she was crying.  Deputy Crawford inquired about Ms. Clark's

injuries, but was interrupted when a man, later identified as Mr. Brickey, appeared on the front

porch of the house and yelled at Deputy Crawford.  There is some dispute about the precise

contents of Mr. Brickey's statements, but it appears that Mr. Brickey inquired of Deputy

Crawford's purpose, told him that the matter was "none of his business," and directed Deputy

Crawford to get off his property.  The Defendants contend that Mr. Brickey added that "if you

try to come in my house, I will shoot you and anyone else"; Mr. Brickey denies having made any

threat to shoot anyone. Mr. Brickey then went back inside the house.

Deputy Crawford retreated to the street to discuss the matter with Ms. Clark, as well as

another Deputy, Defendant Telinde, who had arrived at the scene.  Ms. Clark advised Deputies

Crawford and Telinde that Mr. Brickey may have a gun on the property[1] (but that she was not

sure), and that there was another man besides Mr. Brickey in the house.[2] The Deputies discussed

the situation briefly.

Mr. Brickey again emerged from the house, cursed at the Deputies, and told them to

leave.  The Deputies approached the house with weapons drawn and directed Mr. Brickey to

show his hands.   When the officers approached, Mr. Brickey retreated inside the house and

locked the door and taunted the Officers from inside the house.  Deputy Crawford threatened to

---

[1]      It is undisputed that Mr. Brickey was not carrying a weapon at any point in time during
the events herein and no Defendant claims to have seen what they believed to be a weapon on
Mr. Brickey.

[2]      As noted below, Ms. Clark subsequently made contradictory assertions to officers during
the standoff as to whether the other male was or was not inside the house, and as to whether Mr.
Brickey or the other individual had been the one who hit her.

kick the door in (but was instructed by Deputy Telinde that he "could not do that"). The Deputies then retreated to certain locations on the property to observe possible exits.[3]

Eventually, several additional Sheriff's Department employees, including Defendants Johnson, Lewis, Weyler, Quigley, and Means arrived at the property and were deployed to various locations with weapons drawn.[4] Sergeant Lewis took command of the group, intending to apprehend Mr. Brickey.

This portion of the standoff is captured in a video recording that the parties have submitted. The video is taken from the dashboard camera of a parked Sheriff's Department vehicle, and shows only an oblique, relatively distant, and partially-obstructed view of the front of Mr. Brickey's house. However, the audio portion of the recording provides a relatively clear version of the exchanges between the Deputies (mostly Deputy Weyler, who had approached the front door and conversed with Mr. Brickey) and Mr. Brickey who stood on the front porch. The recording makes clear that Mr. Brickey was extremely agitated and emotional,[5] shouted profanities at the Deputies, and was particularly anxious that the Deputies would shoot him. He repeatedly denied having or owning a gun, and Deputy Weyler repeatedly acknowledged that statement ("it's good that you don't have a gun"). During the conversation, Mr. Brickey apparently started to go back inside the house. Deputy Weyler asked him not to, suggesting that if Mr. Brickey went into the house, Deputy Weyler "ha[d] to go running" back to safety. Mr.

---

[3]     At some point in time, the Deputies entered into the open garage and tried a door leading into the house, but found that door to be locked. The Deputies then returned to their previous positions. It does not appear that Mr. Brickey asserts any claim relating to this act.

[4]     Deputy Johnson was assigned to speak with Ms. Clark away from the property and was not involved in the apprehension of Mr. Brickey.

[5]     At one point, Mr. Brickey states to Deputy Weyler that he has been "off [his] medication [for depression] for three days."

Brickey responded sarcastically: "Oh what, if I shut the door?  I guess the door shuts and a bomb explodes?"

Approximately 16 minutes into the video (and a half-hour after the incident commenced), Mr. Brickey retreated into the house, prompting the Deputies to converge near the front door. When Mr. Brickey re-emerged, Deputy Telinde disabled him with a taser,[6] and Mr. Brickey was taken into custody.  Other deputies entered Mr. Brickey's house to ascertain whether anyone else was present (no one was).  The record does not reflect what charges, if any, were brought against Mr. Brickey, nor the disposition of any such charges.

Mr. Brickey brought this action, alleging two claims: (i) a claim under 42 U.S.C. § 1983 that each of the Defendants "either participated in the illegal seizure of and use of force on [or] failed to prevent the illegal seizure of or use of force on Mr. Brickey," in violation of the 4th Amendment to the United States Constitution; and (ii) a claim, apparently under Colorado common law, that "the conduct set forth . . . constitutes an assault and false arrest and/or aiding and abetting an assault and false arrest of [Mr. Brickey] by each of the defendants."

Both parties move (**# 28, 29**) for summary judgment.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and

---

[6]     According to Sergeant Lewis, Deputy Telinde was authorized to have a taser at the ready, but was not specifically instructed to employ it in the apprehension of Mr. Brickey.  Thus, at least according to Sergeant Lewis, Deputy Telinde's decision to actually use the taser on Mr. Brickey was Deputy Telinde's decision, based on the circumstances as Deputy Telinde perceived them.

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

      If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and  enters

judgment.

      If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment.  "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently."  *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

**B.  § 1983 claim**

Mr. Brickey's § 1983 claim appears to consist of two discrete claims: (i) that he was arrested without probable cause, in violation of the 4th Amendment's protection against unreasonable seizures; and (ii) that his arrest, if otherwise valid, was nevertheless effectuated through the use of excessive force, constituting a separate form of unreasonableness under the 4th Amendment.[7]  The Court addresses each of these contentions in turn.

---

[7]     Moreover, as to each claim, Mr. Brickey has alleged that each Defendant is liable under one of two theories: (i) direct liability for the constitutional violation; or (ii) failure to intercede to halt a constitutional violation.  The parties have not specifically addressed the particular theory and evidence that applies to each individual Defendant, and thus, the Court will not consider those theories separately.

### 1. Arrest

The 4th Amendment ensures that persons will not be subjected to "unreasonable searches and seizures."  To lawfully effect an arrest – that is, a seizure under the 4th Amendment – a police officer must have either a warrant or have probable cause to believe that the person being arrested has committed a crime.[8]  *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010). Probable cause exists where the facts and circumstances within the knowledge of the officer making the arrest (whether personally observed by the officer or obtained trough reasonably trustworthy information) are sufficient in themselves to permit a person of reasonable caution to conclude that the suspect has committed (or is committing) an offense.  *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007).  The quantum of proof necessary to establish probable cause is

---

[8]       The Defendants argue that, alternatively, "exigent circumstances" can permit police to effectuate a warrantless arrest even in the absence of probable cause.  The "exigent circumstances" doctrine permits police to engage in a warrantless <u>entry</u> into a private space in limited situations: (i) the hot pursuit of a fleeing felon; (ii) to prevent imminent destruction of evidence; (iii) to prevent a suspect's escape; or (iv) to prevent danger to the police or other persons inside or outside a dwelling.  *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  However, the "exigent circumstances" doctrine nevertheless requires officers to have probable cause to effectuate any arrest, even in the presence of exigent circumstances.  *U.S. v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) ("officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist").  Thus, the "exigent circumstances" doctrine does not justify a warrantless arrest that lacks any probable cause.

        In any event, police action premised on exigent circumstances must be justified by a showing that, among other things, "the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others."  *Id.* Here, the record indicates a genuine dispute of fact as to whether the Defendants had an objectively reasonable basis to believe that Mr. Brickey posed an immediate risk to them.  Even assuming that the officers initially believed that Mr. Brickey initially made a threat to shoot them (notwithstanding Mr. Brickey's denial of having done so, which the Court must credit in assessing the Defendants' motion), Deputy Weyler repeatedly acknowledged Mr. Brickey's subsequent statements that he did not have or even own a gun.  Moreover, there is little evidence indicating that the Defendants truly believed that Mr. Brickey's apparently sarcastic statements about a "bomb" constituted a genuine threat, as neither Deputy Weyler nor any other Defendant appeared to react to that statement.

"a substantial probability" that the suspect has committed the crime; "bare suspicion" of the suspect is not sufficient. *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012).

### a. Defendants' motion

The Court begins by considering the Defendants' motion. In doing so, it construes all disputed facts in the light most favorable to Mr. Brickey. Most significantly, in Mr. Brickey's version of events, he never threatened to shoot officers.

The Defendants invoke the doctrine of qualified immunity. That doctrine provides that an individual state actor is immune from claims for monetary damages unless the plaintiff can show both: (i) that the actor's conduct deprived him of a constitutional right; and (ii) the contours of that right were "clearly established" at the time of the event. The Court will examine each prong in turn.

### 1. deprivation of a constitutional right

Turning first to the question of whether the facts, taken in the light most favorable to Mr. Brickey, demonstrate a violation of his constitutional rights, the Court notes that the Defendants' potential entitlement to summary judgment on this claim is significantly hampered by the fact that the Defendants do not even agree amongst themselves as to the crime(s) for which Mr. Brickey was being arrested. Sergeant Lewis' deposition testimony states that he intended to take Mr. Brickey into custody for "domestic violence, assault." Similarly, Deputy Means testified that he understood that Mr. Brickey was being arrested for "domestic assault." Deputy Crawford, on the other hand, testified at his deposition that he believed Mr. Brickey was being arrested based on his threats to shoot officers, and that he did not believe he had probable cause to arrest Mr. Brickey on domestic violence charges based on the information Defendants had at the time.

8

The Defendants attempt to overcome this inconsistency by suggesting that they had probable cause to arrest Mr. Brickey for either domestic violence, or for threats to shoot the police officers (or both).   This argument is unavailing, as there is evidence in the record sufficient to create a genuine issue of material fact as to both alleged justifications for Mr. Brickey's arrest.

As to whether probable cause existed to arrest Mr. Brickey for a domestic violence offense, the Court notes that the Defendants' brief does not point to any specific Colorado law that they believed Mr. Brickey had violated.  Sergeant Lewis' affidavit suggests that "we were investigating the crime of Assault in the Third Degree," C.R.S. § 18-3-204, which makes it a crime for a person to "knowingly or recklessly cause[ ] bodily injury to another person."

Deputy Crawford's testimony that he did not believe the Defendants had probable cause to make an arrest for domestic assault is itself sufficient to create a genuine dispute of fact as to whether the other Defendants – all of whom were sharing the same information – similarly lacked probable cause to make such an arrest.  Moreover, the record reflects that the Defendants received significantly conflicting information about whether Mr. Brickey was the person responsible for injuring Ms. Clark.

Deputy Johnson's affidavit indicates that the clearly-intoxicated Ms. Clark made several inconsistent statements to him about the circumstances under which she was beaten, stating variously that "the injuries were the result of falling, and of rafting in the river"; that she "denied that she had been assaulted by a male subject"; that the assault had involved Mr. Brickey and that no one else was present; that she "den[ied] that [Mr.] Brickey was the person who assaulted her," even though no one else was in the house; and that Ms. Clark inquired of others on the scene

whether "Donnie had made it out of the house."[9]  As a result of this information, Deputy

Johnson's affidavit states only that "I came to believe that she had been assaulted and that the

assault <u>may</u> have involved . . . [Mr.] Brickey."  (Emphasis added.)  Similarly, in his deposition,

Deputy Johnson was asked whether he "believe[d]" that the other man ("Donnie"), rather than

Mr. Brickey, had assaulted Ms. Clark, and he responded "up until [a time after the arrest], we

didn't know who had assaulted her."  Thus, Deputy Johnson's testimony establishes, at best, only

a "bare suspicion" that Mr. Brickey might have committed a domestic violence offense, not

probable cause.  Accordingly, the Court finds that, taking the evidence in the light most

favorable to Mr. Brickey, there is a triable issue of fact as to whether the Defendants had

probable cause to arrest Mr. Brickey for a domestic violence offense.

As to whether probable cause existed to arrest Mr. Brickey based on his alleged threats to

shoot (or perhaps blow up) the Defendants, the Defendants' brief again fails to identify  a

particular criminal statute that governs such conduct.  In his deposition testimony, Sergeant

Lewis mentions the offense of Menacing, C.R.S. § 18-3-206.  That offense occurs when a

person, "by any threat or physical action, . . . places or attempts to place another person in fear of

imminent serious bodily injury."  There is necessarily a genuine dispute of fact as to whether Mr.

Brickey committed this offense, insofar as he denies ever threatening to shoot anyone.[10]  There is

---

[9]      In addition to those inconsistencies, Ms. Clark also stated to Deputy Crawford that another male was inside the house during the events.

[10]      The Defendants make a somewhat unclear argument to the effect that the Court should disregard that portion of Mr. Brickey's affidavit that contains the denial that he ever threatened to shoot anyone.  The Defendants' arguments appear to be invoking the "sham affidavit" doctrine – that the Court should disregard a party's affidavit that conflicts with <u>that party's</u> previous deposition testimony, if the affidavit is simply an attempt to create a sham fact issue. *Burns v. Board of County Commissioners*, 330 F.3d 1275, 1281-82 (10th Cir. 2003).  The Court finds that doctrine inapplicable here.  Mr. Brickey's statement that he never threatened to shoot anyone is not inconsistent with his <u>own</u> testimony that he was unaware of the Defendants'

additional evidence corroborating Mr. Brickey's denial: once Deputy Welyer explained to Mr. Brickey that the Defendants were concerned that he had threatened to shoot them, Mr. Brickey repeatedly insisted that he did not have or even own a gun.  A reasonable factfinder could conclude that, in light of Mr. Brickey's repeatedly professed lack of ownership of a gun, Deputy Crawford may have mis-heard or misunderstood some statement by Mr. Brickey that Deputy Crawford mistakenly considered to be a threat.   Indeed, the factfinder might reasonably conclude that, in light of Mr. Brickey's repeated denials of having a gun and making any threats, a reasonable police officer in Deputy Crawford's situation might have, on the scene, reconsidered whether he himself properly perceived and understood the alleged "threat."[11]

Similarly, although the Defendants argue that Mr. Brickey's "threat" to "blow up the house" constituted a separate act of Menacing, the evidence taken in the light most favorable to Mr. Brickey indicates that the statement was nothing more than sarcasm that was, at most, merely misunderstood by the Defendants.  The crime of Menacing focuses on the perpetrator's intent to cause fear, or recognition that his conduct is "practically certain" to cause fear.  *People v. District Court*, 926 P.2d 567, 571 (Colo. 1996).  Taken in the light most favorable to Mr. Brickey, the evidence could permit a reasonable inference that Mr. Brickey did not reasonably

---

presence until several deputies were on the scene, even though it may be inconsistent with Deputy Crawford's testimony that the threat was made when Deputy Crawford was the only Defendant present.   In any event, the Defendants have not pointed the Court to any prior statement or testimony by Mr. Brickey that is squarely contrary to his affidavit – *e.g.* a statement in which Mr. Brickey admits making a threat to shoot officers.

[11]     Deputy Telinde also submitted an affidavit in which he makes a veiled reference to also hearing Mr. Brickey threaten to shoot officers.  He states "as I testified in my deposition, I heard him state that he was going to 'shoot you guys'."  Notably, the Defendants have not tendered any portion of Deputy Telinde's deposition to this effect, making it impossible for the Court to consider Deputy Telinde's allegations in any degree of detail.

expect that his plainly sarcastic question about a bomb would cause apprehension in the Defendants.

Accordingly, the Court finds that, taking the evidence in the light most favorable to Mr. Brickey, there is a genuine dispute of fact as to whether the Defendants had probable cause to arrest him for any offense.   Thus, the Defendants are not entitled to summary judgment on his 4th Amendment claim premised on the lack of such cause.

2. "clearly established"

Having concluded that Mr. Brickey has made a sufficient showing of a deprivation of a constitutional right so as to proceed to trial, the Court must then address the second prong of the qualified immunity analysis: whether the contours of the 4th Amendment right alleged by Mr. Brickey were "clearly established" as of August 21, 2010.

For a right to be "clearly established," ordinarily, there must be a Supreme Court or 10th Circuit decision on point, or the clear weight of authority from other circuits must recognize that right. *Schwartz v. Booker*, 702 F.3d 573, 587-88 (10th Cir. 2012).  The "clearly established" analysis takes place "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Thus, it is incumbent upon a plaintiff to identify controlling authority finding a constitutional deprivation in circumstances sufficiently similar to the instant case in all relevant respects that a reasonable police officer would understand the application of the existing precedent to the events in question. *Id.* However, it is not necessary for the plaintiff to identify caselaw addressing "the very action in question." *Schwartz*, 702 F.3d at 588.  There are circumstances where the constitutional right is so obvious and well-recognized that citation to conforming caselaw is unnecessary. *Brosseau*, 543 U.S. at 199.  As with every other aspect of summary judgment, the Court conducts the

"clearly established" analysis on a view of the facts taken in the light most favorable to the non-movant – Mr. Brickey.  *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Here, the general contours of a person's 4th Amendment right to be free from a warrantless arrest, unsupported by probable cause, is so axiomatic as to require no particular citation.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  Under Mr. Brickey's version of events, he made no threats against the Deputies (or anyone else), and the worst that can be said of him was that he shouted profanities at law enforcement officers from the porch of his home.  In *Stearns v. Clarkson*, 615 F.3d 1278, 1283-84 (10th Cir, 2010), the 10th Circuit noted that "it [is] well-settled that profanity, especially toward police officers, does not" create probable cause to arrest a person even for disorderly conduct, much less any other offense. Thus, the Court finds that, taking the facts in the light most favorable to Mr. Brickey, the Defendants' actions violated his clearly established 4th Amendment rights.

> b. <u>Mr. Brickey's motion</u>

Mr. Brickey seeks summary judgment in his favor on his claim that his arrest occurred without probable cause.  When considering Mr. Brickey's motion, the Court views the facts most favorably to the Defendants.  In doing so, the Court now credits Deputy Crawford's contention that Mr. Brickey expressly threatened to shoot the officers on the scene.

Viewed in this light, there would be probable cause to arrest Mr. Brickey for, at the very least, Menacing.  That crime is complete upon the perpetrator making a threat with the requisite intent to cause fear; it is irrelevant whether the victim subjectively believed the threat might be carried out.  *District Court*, 926 at  571.  Here, Deputy Crawford observed that Mr. Brickey was visibly agitated, angry, and shouting profanities at him, insisting that Deputy Crawford stay off Mr. Brickey's property.  Those circumstances could very well permit the factfinder to conclude

that Mr. Brickey did indeed intend his threat to intimidate Deputy Crawford (and any other police officer) into staying away out of fear of being injured.  Thus, the evidence is susceptible to an interpretation in which the Defendants had probable cause to arrest Mr. Brickey for Menacing.

Moreover, a reasonable factfinder might conclude that the evidence demonstrated probable cause to arrest Mr. Brickey for a domestic violence offense.  Although Deputy Johnson admittedly received inconsistent information from Ms. Clark about her assailant, he directly confronted her with those inconsistencies (including his knowledge that she might be dissembling to cover up fact that the other male in the house might be the real assailant), and "asked [her] if she was really willing to accuse [Mr. Brickey] of being the one involved and assaulted her in an effort to protect [the other male] and [she] stated that she was."  Arguably, the factfinder could conclude that Deputy Johnson was reasonable in deciding that this information, among the many statements made by Ms. Clark, was the most credible and thus gave the Defendants probable cause to effectuate the arrest of Mr. Brickey on domestic violence charges.

Accordingly, the Court finds that Mr. Brickey is not entitled to summary judgment on his claim of arrest without probable cause.  That claim will proceed to trial.

### 2.  Excessive force

The Court turns to Mr. Brickey's claim that, in effectuating his arrest, the Defendants used excessive force in violation of the 4th Amendment.  The Court understands this claim to arise entirely out of the fact that Deputy Telinde used a taser to subdue Mr. Brickey.

To establish a § 1983 claim based on a 4th Amendment deprivation arising from police use of excessive force in making an arrest, Mr. Brickey must show that the Defendants used an objectively excessive amount of force in light of the facts and circumstances confronting them.

14

*Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).  The determination is a factually-intensive one, examining, among other things, the severity of the crime for which the arrest is being made, whether the suspect poses an immediate threat to the safety of officers, and whether he is actively resisting or attempting to evade arrest.  *Id.*

Where, as here, claims of excessive force are coupled to viable claims of unlawful arrest, the Court may not simply assume that all force used to carry out a potentially unlawful arrest was, by definition, excessive; rather, the Court is required to assess the excessive force claim "under the assumption that the arrest was lawful."  *Romero v. Story*, 672 F.3d 880, 890 (10th Cir. 2012).  In other words, "in a case where police effect an arrest without probable cause . . . but use no more force than would have been reasonably necessary if the arrest or detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force."  *Id.*

Once again, because the Defendants are seeking summary judgment on Mr. Brickey's excessive force claim, the Court examines the facts underlying that claim in the light most favorable to Mr. Brickey – that is, assuming that Mr. Brickey did not make any threats against the officers.  Taken in that light, the record discloses few facts from which the Court could conclude that a reasonable police officer would believe that tasing Mr. Brickey was necessary to effectuate his arrest.  Arguably, the severity of the crime giving rise to the arrest – presumably domestic assault – is moderately serious: it is a violent crime, but one which presumably poses a less direct threat to the officers effecting the arrest than a more indiscriminate violent crime might.  Accepting that Mr. Brickey never made any threats against the Deputies, it is difficult to see a how he posed an immediate threat to their health or safety.  He was certainly agitated and upset, but as Deputy Weyler's extended discussion with him makes clear, Mr. Brickey was

mostly concerned with the fact that the Deputies were aiming weapons at <u>him</u> – that is, that his agitation was the result of a perceived threat to <u>his</u> safety. Admittedly, Mr. Brickey was not entirely cooperative with Deputy Weyler's requests that he keep his hands visible or that he refrain from retreating into the house, but at the same time, the record does not reflect that the Defendants ever stated to Mr. Brickey that they intended to place him under arrest or requested that he submit to a peaceful arrest. By all appearances, Mr. Brickey remained unaware of the Defendants' intent to arrest him until after he had been subdued. Under these circumstances, the Court cannot say that, as a matter of law, a reasonable police officer would objectively believe that the only appropriate way to effectuate a surprise arrest of Mr. Brickey was via the use of a taser.

The Court further finds that the law clearly establishes that police officers cannot lawfully resort to deploying a taser to arrest a non-violent suspect without first giving any warnings to the suspect or attempting to obtain the suspect's compliance via voluntary instructions. *Casey,* 509 F.3d at 1285-86.

Accordingly, the Court finds that the Defendants are not entitled to summary judgment on their defense of qualified immunity to Mr. Brickey's excessive force claim, and that claim will proceed to trial.

### C. Assault claim

Finally, Mr. Brickey asserts what appears to be a tort claim of assault, arising under state law.[12] The Defendants seek summary judgment on this claim, arguing: (i) that C.R.S. § 18-6-803.6(5) immunizes them against any tort clams based on their effecting a domestic violence arrest; and (ii) that Mr. Brickey has not adequately pled facts sufficient to show "willful and

---

[12]    To the extent Mr. Brickey can be understood to assert other claims sounding in tort – *i.e.* false arrest – the same reasoning applies.

wanton conduct" by the Defendants, sufficient to remove his tort claims from the immunity conferred on the Defendants by the Colorado Governmental Immunity Act, C.R.S. § 24-10-106.

The Court has some doubt that statutory immunity conferred upon officers effecting a domestic violence arrest with probable cause applies here, insofar as the Court has already found a genuine dispute of fact as to what crime Mr. Brickey was being arrested for, much less whether the Defendants had probable cause to effect such an arrest.

However, Mr. Brickey has not materially responded to the Defendants' contention that they are entitled to immunity under the Governmental Immunity Act due to Mr. Brickey's failure to demonstrate that their conduct was "willful and wanton." Public employees generally enjoy the immunity from suit provided by the Governmental Immunity Act for acts taken within the scope of their duties, but are stripped of that immunity where the acts alleged are "willful and wanton." C.R.S. § 24-10-105(1); *Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 197-98 (Colo.App. 2012). There are no express definitions of the phrase "willful and wanton," but Colorado courts have generally held that to constitute "willful and wanton" conduct, the public employee "must be consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act . . . without regard to that danger or risk." *Gray*, 284 P.3d at 198. Proving that the Defendants actions were willful and wanton is Mr. Brickey's burden. *Smith v. Board of Ed.*, 83 P.3d 1157, 1167 (Colo.App. 2003).

The Court finds that Mr. Brickey has failed to allege, much less demonstrate a triable issue of fact, that the Defendants consciously recognized that their actions were creating a danger or risk to Mr. Brickey, but nevertheless disregarded that risk. As noted above, there is evidence in the record to indicate that the Defendants acted without probable cause in arresting Mr. Brickey, and arguably, there might even be evidence that the Defendants acted negligently in

correctly assessing and adapting to the realities of the situation (*i.e.* by failing to obtain more information when inconsistencies appeared, or by failing to request Mr. Brickey to submit to voluntary arrest).  However, the Court cannot say that there is evidence that the Defendants consciously recognized that they lacked probable cause to arrest Mr. Brickey, or subjectively concluded that the force they were using was excessive, and yet proceeded to act despite that recognition.  Mr. Brickey points to no evidence in which the Defendants acknowledged having entertained the possibility that their actions were not legally justified before proceeding to act nevertheless, nor does he point to facts that would permit a jury to conclude that the Defendants did so; to the contrary, the Defendants' actions are, facially, consistent with their professed belief that they were effecting a lawful arrest of Mr. Brickey.

Accordingly, the Court finds that Mr. Brickey has failed to demonstrate that the Defendants' actions were "willful and wanton" such that they fall outside the otherwise applicable grant of immunity under the Governmental Immunity Act.  The Defendants are therefore entitled to summary judgment on Mr. Brickey's tort claims.

## CONCLUSION

For the foregoing reasons, Mr. Brickey's Motion for Partial Summary Judgment (**# 28**) is **DENIED**.  The Defendants' Motion for Summary Judgment (**# 29**) is **GRANTED IN PART**, insofar as the Defendants are entitled to summary judgment on Mr. Brickey's tort claims under the Governmental Immunity Act, and **DENIED IN PART**, insofar as Mr. Brickey's § 1983 claims for arrest without probable cause and excessive force shall proceed to trial.  The parties shall begin preparation of a Proposed Pretrial Order pursuant to the previously-issued Trial

Preparation Order **(# 18)**, and shall jointly contact chambers promptly to schedule a Pretrial

Conference.

Dated this 19th day of March, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge